# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 1799 | **DATE** | 11/22/2002 |
| **CASE TITLE** | Lemont Partners, LLC vs. Meijer Stores Limited Partnership | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Meijer's motion to dismiss (Doc. No. 12-1) is granted in part and denied in part. Count IV is dismissed without prejudice. Defendant's motion to dismiss Counts I, II and III is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | **NOV 26 2002** | | |
| | Notified counsel by telephone. | | date docketed | | **26** |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | 11/25/2002 | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |
| ETV | courtroom deputy's initials | | | | |

U.S. DISTRICT COURT
CLERK
02 NOV 25 AM 10: 18
FILED IN
central Clerk's Office
Date/time received in

LEMONT PARTNERS, LLC., an Illinois )
Limited Liability Company, )
 )
   Plaintiff, )
 )
   v. )  No. 02 C 1799
 )
MEIJER STORES LIMITED PARTNERSHIP, )  Judge Rebecca R. Pallmeyer
a Michigan Limited Partnership and )
MEIJER, INC., a Michigan Corporation, )
 )
   Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiff Lemont Partners ("Plaintiff"), a limited partnership, and its predecessor, Reliant, purchased property in Will County, Illinois for development as a shopping center. In this lawsuit, Plaintiff claims that Defendants Meijer Stores Limited Partnership and Meijer, Inc. (collectively "Meijer") agreed to construct a Meijer SuperStore as the shopping center's anchor store.[1] The amended complaint seeks relief from Meijer's failure to proceed with the project as promised under breach of contract, promissory estoppel, and tort theories. Meijer has moved to dismiss all four counts of Plaintiff's amended complaint, but the court concludes, for the reasons explained below, that Plaintiff has adequately alleged claims of breach of contract (Counts I and II) and promissory estoppel (Count III). Plaintiff's tort claim for negligent misrepresentation (Count IV) is dismissed without prejudice.

## FACTUAL BACKGROUND

### Reliant's Option to Purchase Goodings Grove

In March 2000, Reliant identified a vacant parcel of agricultural land in unincorporated Will

---

[1]  The court is satisfied that the requirements for diversity jurisdiction have been adequately pleaded, as Plaintiff's Amended Complaint states that its partners are all citizens of Illinois, Meijer Inc. is a citizen of Michigan, and Meijer Stores Limited Partnership's partners are all citizens of Michigan.



County for development of a shopping center. (Amended Complaint, hereinafter "Am. Comp." ¶ 7.)[2] The property, approximately 200 acres zoned for agricultural use, was owned by the Orchard Hill Building Company ("Orchard Hill"). In order to investigate the feasibility of developing the site, on approximately March 20, 2000, Reliant obtained an option to purchase 48 acres from Orchard Hill. (Id.) In the same agreement Reliant obtained the option to purchase an additional 20 acres adjacent to the 48 acre parcel from Orchard Hill. (Purchase Agreement between Orchard Hill and Reliant of 3/20/00, Ex. 1 to Am. Comp., hereinafter "3/20/00 Purchase Agreement."[3]) The 3/20/00 Purchase Agreement does not explain how Reliant would choose whether to exercise either of its options, but in its amended complaint Plaintiff alleges that the purchase of the additional 20 acre property depended on whether Reliant found a developer for those 20 acres. (Am. Comp. ¶ 9.) The approximately 68 acre parcel that was the subject of the Orchard Hill option was subsequently named Goodings Grove. (Id. ¶ 18.)

**Negotiations with Meijer**

Upon obtaining the option to acquire the property from Orchard Hill, Reliant approached Meijer officials to explore Meijer's interest in jointly developing the property, with a Meijer SuperStore ("SuperStore") as the anchor of the shopping center. (Id. ¶ 8.) Meijer has developed and operates approximately 150 SuperStores and SuperCenters in Kentucky, Ohio, Indiana, Illinois and Michigan. (Id. ¶ 20.) On July 26, 2000, Reliant and Meijer entered into an option contract which gave Meijer the option to purchase approximately 20 acres of the Goodings Grove development from Reliant. (Real Estate Option Contract between Reliant and Meijer of 7/26/00,

---

[2]     Reliant is an Illinois limited partnership with the same partners as Plaintiff, which until January 2001 engaged in activities with Meijer that led to the current lawsuit. Reliant assigned its rights to Plaintiff in January 2001. (Am. Comp. ¶ 2.)

[3]     Documents attached to the complaint are incorporated into the plaintiff's pleadings. FED. R. CIV. P. 10(c). *See Northern Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452-53 (7th Cir. 1998).

Ex. 2 to Am. Comp., hereinafter "7/26/00 Option Contract.") Plaintiff alleges Meijer agreed that if Meijer were to exercise its option, it would build and operate an approximately 190,000 square foot combination grocery and general merchandise store ("SuperStore") and a gas station/convenience store (collectively "Supercenter"). (Am. Comp. ¶ 19; 7/26/00 Option Contract ¶ 11.) Paragraph 28 of the 7/26/00 Option Contract states: "This Contract. . .contains the entire agreement between the parties with respect to the subject matter hereof and supercedes all prior understandings with respect thereto." (Id. ¶ 28.) Plaintiff alleges that if Meijer decided to build the SuperStore and exercise its option, Reliant planned to exercise its option with Orchard Hill for the entire 68 acres. (Am. Comp. ¶ 9.) Alternatively, Plaintiff claims that if Meijer decided not exercise its option, Reliant intended to seek out a different anchor store for the shopping center. (Id.)

From July 26, 2000 through January 17, 2001, Reliant, Plaintiff and Meijer investigated the feasibility of going forward with the development of Goodings Grove. (Id. ¶ 21.)[4] During this time, Plaintiff claims that "Meijer agreed and promised to go forward with the purchase, exercised its option, and continued to promise to start construction of its SuperStore by August 2001." (Id. ¶ 21.) Plaintiff does not identify the specific Meijer officials who made such representations. On numerous occasions between August 2000 and December 2000, Plaintiff alleges that Meijer represented to zoning officials of Will County and to the Will County Board that governmental zoning approvals had to be obtained by January 2001, because Meijer had to exercise its option to buy the 20 acres from Reliant and close the transaction by that date in order to start construction of the SuperStore by August 2001. (Id. ¶ 22.) Without identifying the individuals involved in the alleged communications, Plaintiff alleges that Meijer advised Plaintiff that if the approvals were not obtained, development would not proceed at all. (Id.)

---

[4]     The court is unsure as to the exact role Plaintiff Lemont played, if any, before it received an assignment of rights from Reliant in January 2001. The facts in this regard are no more specific in the amended complaint than they are in this opinion.

3

The 7/26/00 Option Contract contemplated Plaintiff and Meijer's execution of additional documents, and identifies those additional agreements by name: "Purchaser and Seller have negotiated and are prepared to enter into the Development Agreement and the [Reciprocal Construction, Operation and Easement] Agreement specified in Paragraphs 13 and 14." (7/26/00 Option Contract ¶ 9(C), Ex. 2 to Am. Comp.) Paragraph 13 explains that the Development Agreement would set forth terms and conditions for development and operation of the property, and Paragraph 14 refers to "a Reciprocal Construction, Operation and Easement Agreement (the 'RCOE Agreement')" which would "be executed at closing and filed of record against the Development . . ." (Id. ¶¶ 13, 14.)

**Planned Unit Development Submission**

In October 2000, Reliant submitted to Meijer for review and approval the Final Amended Narrative for Planned Unit Development, which Reliant subsequently submitted to the Land Use Committee of Will County and the Will County Board ("PUD Submission") (Am. Comp. ¶ 22), presumably pursuant to the 7/20/00 Option Contract which provided that "[a]ll plans and specifications for work and improvements on the Property . . . shall be subject to Purchaser's review and approvals, not to be unreasonably withheld." (7/26/00 Option Contract ¶ 13.) With Meijer's approval, the PUD Submission became part of an ordinance adopted by the Will County Board on December 21, 2000, as Ordinance No. 4846-M3S3. (Am. Comp. ¶ 22.) The PUD Submission, which Meijer allegedly signed off on, estimated that construction of the SuperStore would begin by May 2001 and be completed by November 2002. (PUD Submission at 13, Ex. 3 to Am. Comp.) The PUD Submission does, however, contain the disclaimer that "[i]t is important to note that the foregoing dates are in fact estimates. These dates may vary due to weather or other circumstances beyond the control of Reliant." (Id.)

Other provisions of the PUD confirm the parties' intentions. The PUD Submission identifies

4

Reliant as the developer of the Goodings Grove shopping center and Meijer as developer of the Meijer tract. Exhibit L to the PUD Submission is an Operation and Easement Agreement between Meijer and Plaintiff which identifies Meijer as the owner of a tract of land on the proposed shopping center site, and states that "Developer [Plaintiff] acknowledges that Meijer proposes to construct on the Meijer Tract its typical retail store which is generally classified as an 'unlimited area' building under certain applicable building codes. . . ." (Operation and Easement Agreement Art. 3.3, Ex. L to PUD Submission, Ex. 3 to Am. Comp.)

**Reliant Contracts with Orchard Hill and LaSalle Bank**

On January 15, 2001, Reliant and Orchard Hill entered into an agreement to divide responsibilities, work and costs for the development of Goodings Grove. (Orchard Hill Site Development Agreement, hereinafter "Orchard Hill SDA," Ex. 6 to Am. Comp.) Reliant agreed, among other things, to dedicate rights-of-way, pay for and construct road improvements including curbs, grading and storm sewers, traffic signals, entrance roads, various utilities including sanitary sewers, storm sewers, water lines, and public utilities with sufficient capacity necessary to accommodate the intended construction and operation of the SuperStore and the other contemplated commercial development of Goodings Grove. (*Id.*) Plaintiff claims that all of the deadlines Reliant agreed to in the Orchard Hill SDA mirrored the dates Meijer had demanded in order to begin construction of the SuperStore by August 2001. (Am. Comp. ¶ 25.)

Between July 2000 and January 17, 2001, Plaintiff negotiated the terms of a construction loan with LaSalle Bank. (*Id.* ¶ 26.) To demonstrate the feasibility of the Goodings Grove development, Plaintiff disclosed to LaSalle Bank Plaintiff's joint development plans with Meijer, including Meijer's alleged demand for an accelerated schedule. (*Id.*) LaSalle Bank requested and Plaintiff agreed to include a provision in the proposed construction loan under which Meijer's failure to commence construction of the SuperStore by December 31, 2001 would constitute a default on

5

the part of Plaintiff. Although Plaintiff is not specific about how or when this information was conveyed to Meijer, Plaintiff alleges that prior to January 17, 2001, Meijer was aware of the fact that the terms of the LaSalle loan were specifically structured in reliance upon Meijer's promises to begin construction of the SuperStore by August 2001, including the default provision if Meijer did not commence construction by December 31, 2001. (*Id.*) In January 2001, Plaintiff signed and closed on the LaSalle construction loan. (*Id.* ¶ 28.)

**January 17, 2001 Transactions**

On January 17, 2001, Reliant assigned its rights to Plaintiff, and Plaintiff exercised the Orchard Hill option, acquired approximately 68 acres of property from Orchard Hill for $12.9 million and simultaneously sold approximately 20 acres of Goodings Grove to Meijer for $7.1 million, prices set in the 7/26/00 Option Contract. (Am. Comp. ¶ 28.) The 7/26/00 Option Contract required that Plaintiff reimburse Meijer for $1.3 million of the purchase price for work to be completed pursuant to the Site Development Agreement. (7/26/00 Option Contract, Ex. 2 to Am. Comp.) Plaintiff claims that its decision to exercise the option was in reliance upon Meijer's promise to begin construction of the SuperStore by August 2001. (Am. Comp. ¶ 13.)

As contemplated in the 7/26/00 Option Contract, Plaintiff and Meijer also entered into two additional written agreements on January 17, 2001. The first of these, the Site Development Agreement (SDA), related to coordination and integration of the development work on Meijer's tract and the remainder of the property. (SDA, Ex. 4 to Am. Comp.) Another, the Operation and Easement Agreement ("OEA"), concerned how Plaintiff and Meijer would operate and develop their respective parcels. (OEA, Ex. 5 to Am. Comp.) Plaintiff and Meijer agreed in the SDA and OEA that the PUD Submission was incorporated into the SDA and the OEA. Specifically, the SDA provides that "[t]he Property shall be developed in accordance with the Planned Unit Development (the 'PUD') . . ." and states "Meijer and Developer hereby agree that each will be solely responsible

for construction of buildings and final Site Work to be performed on their respective tracts, including all landscaping as required in the PUD." (SDA Recital C, § 5, Ex. 4 to Am. Comp.) The SDA also recites that "[d]eveloper and Meijer hereby agree to cooperate with each other in order that the work being performed on the Property shall be completed in a timely fashion, in accordance with the schedules contained in this Agreement or as otherwise agreed by the parties, and at no unreasonable increase in cost to the other." (Id. § 3(E).) Notably, Meijer specifically agreed in the SDA that economic problems would not constitute an excuse for delay in its performance of its obligations. (Id. § 7.) The OEA states that "Meijer and Plaintiff Partners have agreed to develop and operate certain aspects of their respective portions of the Development as an integrated retail and commercial center." (OEA ¶ D, Ex. 5 to Am. Comp.) In the OEA, Meijer granted Plaintiff a temporary easement over Meijer's tract to enable Plaintiff to perform site work (grading, construction and balance) to prepare the tract for construction of the SuperStore. The parties agreed the easement would terminate on August 1, 2001 or upon Plaintiff's finishing the site work, whichever was earlier. (Id. § 6(a).) Plaintiff alleges that it agreed to record a covenant running with the entire approximately 68 acres that would prohibit Plaintiff from utilizing its tract for numerous purposes which Meijer allegedly believed would be competitive with, and harmful to, Meijer's operation of the SuperStore. (Am. Comp. ¶ 24(g). See also OEA §§ 9(d), 9(e), Ex. 5 to Am. Comp.)

**Plaintiff's Action in Reliance on Meijer**

On March 15, 2001, allegedly in reliance upon Meijer's commitment to begin construction by August 2001, Plaintiff entered into an Agreement with Will County in which Will County agreed to "purchase" the road improvements Reliant planned to make to prepare for the shopping center, and in return Reliant agreed "not to annex the Property into any municipality and to remain in

7

unincorporated Will County for a period of twenty years."[5] (*Id.* ¶ 29; Agreement to Purchase Road Improvements and Covenant Not to Annex with Will County ¶ D, Ex. 7 to Am. Comp.) Plaintiff agreed in the contract to upgrade existing roads, install new traffic signals, construct new roads, and design and construct related improvements that Plaintiff claims would not have been necessary but for the traffic the SuperStore was expected to generate. (Am. Comp. ¶ 29.) According to Plaintiff, this promise guaranteed Will County a source of sales tax revenues from the Goodings Grove development. (*Id.*)

Plaintiff alleges that from July 2000 through March 2001 Meijer insisted that Plaintiff shoulder substantial expense to ensure that Meijer could begin construction of the SuperStore by August 2001, requiring that:

a)    Lemont obligate itself to expend over $200,000.00 for full engineering work prior to even obtaining the necessary zoning changes;

b)    Lemont authorize Will County, at Plaintiff's expense, to retain an outside traffic engineering firm to review permit plans on an expedited basis because Will County (which would have performed the same review at no cost to Plaintiff) could not perform the work on the expedited schedule demanded by Meijer.

(Am. Comp. ¶ 30.)

### Meijer Balks at Proceeding with Construction

In approximately March 2001, Meijer announced for the first time that it was not going to begin construction of the SuperStore by August 2001. (*Id.* ¶ 31.) Plaintiff claims Meijer eventually agreed to begin construction of the SuperStore by April 1, 2002 in exchange for the personal guarantee by the owners of Reliant and Plaintiff that $1.3 million of the $7.1 million that Meijer had paid to Plaintiff on January 17, 2001 would remain available to fund the construction of the improvements to Meijer's tract pursuant to the SDA and other agreements of the parties. (*Id.* ¶ 32.) A letter dated May 17, 2001 from the Reliant owners to Meijer confirmed that the $1.3 million for

---

[5]    The court interprets this to mean Will County agreed to pay for road improvements.

on-site work to be performed by Plaintiff pursuant to the 7/26/00 Option Contract was still available.[6] The letter also stated that:

> We are delivering this letter to you based upon your representation that you will deliver us a letter from Meijer, stating that you will commence construction on your store at 143rd & Bell no later than April 1, 2002, and diligently pursue completion subject only to force majeur. We are expecting to receive your letter by the end of the day tomorrow, so that we can reassure our other tenants of your schedule as we meet during the ICSC next week.

(Letter from Collins, Hulina and Riordan to Middlebrook and Price of 5/17/01, Ex. 8 to Am. Comp.) Meijer's general counsel prepared a letter to Mary Riordan, a Reliant and Lemont partner, dated May 18, 2001, signed by Meijer's Senior Real Estate Manager, which stated: "This letter is to confirm that, as per our agreement, Meijer will commence construction of the project at the above referenced site [143rd Street & Bell Road, Plaintiff, Will County, Illinois] by April 1, 2002, subject only to delays due to force majeure." (Letter from Middlebrook to Riordan of 5/18/01, Ex. 9 to Am. Comp.) Plaintiff alleges Meijer agreed to deliver this letter "so that Lemont could provide written assurance to the third parties with whom Plaintiff was dealing that Meijer, in fact, agreed to commence construction of its SuperStore no later than April 1, 2002." (Am. Comp. ¶ 33.) Plaintiff claims that Meijer verbally confirmed on May 18, 2001, and by its subsequent conduct, that the "project" referred to in the 5/18/01 letter was the SuperStore. (Id.)[7]

Plaintiff alleges that between May 17, 2001 and February 2002, Meijer represented to Plaintiff and other third parties including contractors, that Meijer intended to begin construction of

---

[6] The court is uncertain why Reliant, after it assigned its rights to Plaintiff in January 2001, continued to negotiate with Meijer.

[7] As explained below, this dispute is not material to its ruling on this motion, but the court notes the documents involved do not provide a clear definition of the term "project." The PUD refers to the "Retail Project," and defines it as the "Goodings Grove Shopping Center." (PUD Submission, Ex. 3 to Am. Comp.) The SDA refers to the "Project Engineer" which it defines as the engineering firm employed by Plaintiff to prepare final plans and specifications for development of the property. (SDA § 2, Ex. 4 to Am. Comp.) The court has not found any other reference to a "project" in the documents attached to Plaintiff's amended complaint.

the SuperStore before April 1, 2002. (Am. Comp. ¶ 35.) Meijer was aware that Plaintiff was informing third parties, including purchasers of parcels of Plaintiff's tract, that Meijer had agreed to commence construction of the SuperStore by April 2002. (*Id.*) Although Plaintiff does not specify individuals who took any of these actions, Plaintiff claims that at a May 30, 2001 meeting involving Plaintiff, Meijer and the engineering and construction consultants, Meijer agreed and promised to begin construction of the SuperStore by April 2002. (*Id.*)

In reliance upon Meijer's May 18, 2001 agreement to begin construction of the SuperStore by April 2002, Plaintiff agreed to modifications of the LaSalle Bank construction loan, entered into contracts worth millions of dollars to sell parcels of Plaintiff's tract to third parties, and agreed to modifications in the road contract with Will County in which Plaintiff committed to expending approximately $1 million by changing the scope and timing of the work to be performed. (*Id.* ¶ 37.) Plaintiff spent in excess of $4.5 million between May 18, 2001 and February 6, 2002 to develop Goodings Grove, allegedly in reliance on Meijer's promise to commence construction of the SuperStore by April 2002. (*Id.* ¶ 37.) Other activities Plaintiff claims it performed in reliance on Meijer's promise include:

1) Preparing and obtaining approval for the preliminary plat of subdivision and final plat of subdivision;

2) Negotiating and obtaining approval for a Planned Unit Development;

3) Making commitments to Will County for road improvements necessary to handle the traffic that was anticipated at the new shopping center;

4) Bringing the necessary utility services to the property;

5) Grading and preparing Meijer's property to enable Meijer to begin construction;

6) Agreeing to provisions in Lemont's financing for the acquisition of the land and construction costs that would create a default if Meijer did not begin construction of the SuperStore by December 2001;

7) Entering into contracts to sell portions of the land retained by Lemont for millions of dollars, and, based on Meijer's written confirmation of its intent

10

to begin construction by April 1, 2002, agreeing that the purchasers did not have to close until Meijer began construction;

8)    Agreeing to easements and covenants running with Lemont's land that prohibited Lemont's land from being utilized for purposes that competed with Meijer's Superstore.

(*Id.* ¶ 15.)

On February 6, 2002, Meijer announced that it would not start construction of the SuperStore at anytime in 2002, and made no new commitment to begin construction in the future. Meijer informed Plaintiff that if it started construction on anything in 2002, it would likely be on the gas station/convenience store portion of its tract rather than the SuperStore. (*Id.* ¶ 38.) Meijer explained that its decision was due to unanticipated economic events: "September 11th and the recession have had a profound effect on the economy and retail business. These economic considerations have required us to significantly alter our plans for the development of this project." (*Id.* ¶ 39.) Meijer did not begin construction of the SuperStore by April 2002. (*Id.* ¶ 40.)

Plaintiff claims it is precluded from obtaining a suitable anchor tenant necessary to attract other purchasers or tenants because Meijer owns the approximately 20 acre prime location on the property, and because Plaintiff recorded covenants with Meijer that prohibit Plaintiff's tract from being utilized for purposes that compete with the SuperStore. (*Id.* ¶ 44.) Plaintiff claims, further, that if Meijer does not begin construction of the SuperStore in the near future, Plaintiff will suffer irreparable harm in that LaSalle Bank may not agree to further extensions of the construction loan, and Plaintiff may be deemed in default under the construction loan which may lead LaSalle to attempt to foreclose on Plaintiff's tract. (*Id.* ¶ 47.) Plaintiff may be held liable for the balance of the loan and Plaintiff's partners may be required to pay the balance of the loan pursuant to their personal guarantees of the LaSalle loan. Purchasers of the outlots on Plaintiff's tract may cancel their contracts to purchase from Plaintiff, and the value of Plaintiff's property will be substantially diminished. (*Id.*)

Plaintiff sued Meijer for breach of contract, promissory estoppel, and negligent misrepresentation, seeking a preliminary and permanent injunction compelling Meijer to construct the SuperStore or in the alternative, money damages. Meijer moves to dismiss all counts of Plaintiff's Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

## DISCUSSION

### A.    Standard of Review

In deciding a motion to dismiss for failure to state a claim, the court considers the allegations in the complaint to be true and views all well-pleaded facts and any reasonable inferences drawn from the facts in the light most favorable to the plaintiff. *See Maple Lanes, Inc. v. Messer*, 186 F.3d 823, 824-25 (7th Cir. 1999). The court should grant the motion to dismiss only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 825 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). Both Plaintiff and Meijer agree that Illinois law applies to these claims arising out of a contract for development of property in Illinois, and the court concurs.

### B.    Breach of Contract

Plaintiff alleges that Meijer breached its contractual obligation to commence construction of the SuperStore by August 2001, and subsequently broke its promise to begin by April 1, 2002. Meijer denies the existence of an enforceable contract requiring it to begin construction by either of these dates.[8]  To state a claim for breach of contract, Plaintiff must allege that (1) a contract existed; (2) Plaintiff performed its contractual obligations; (3) Meijer breached the contract; and (4) Plaintiff suffered damages because of that breach. *Industrial Hard Chrome Ltd. v. Hetran, Inc.*, 64

---

[8]     Counts I and II are identical breach of contract claims, differing only in their alternative requests for relief. Count I asks for equitable relief; Count II seeks money damages.

F.Supp.2d 741, 745 (N.D. Ill. 1999). There is no dispute that Plaintiff has adequately alleged elements (2) and (4). The parties agree that they entered into a contract for the sale and development of a shopping center at Goodings Grove, but they argue over whether the terms of the contract required Meijer to begin construction of the SuperStore by August 2001 or April 2002.

Plaintiff claims that Meijer agreed to begin construction by August 2001, both in the PUD Submission and in oral conversations. Challenging this assertion, Meijer points to the language in the PUD Submission that emphasizes that the dates set forth in the submission are "estimates" that "may vary due to weather or other circumstances beyond the control of Reliant." (PUD Submission at 13, Ex. 3 to Am. Comp.) The fact that the PUD language gave *Reliant* some flexibility with respect to construction dates is not necessarily inconsistent with Plaintiff's allegations that *Meijer* committed to begin construction by August, however. The complaint's allegations, accepted as true and construed in the light most favorable to Plaintiff for purposes of this motion, include a claim that Meijer agreed orally to begin construction of the SuperStore by August 2001.

Meijer argues any alleged oral agreement is inadmissible under the "four corners" rule. Traditional contract interpretation principles in Illinois require that "[a]n agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence." *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill.2d 457, 462, 706 N.E.2d 882, 884 (Ill. 1999) (citation omitted). In applying the "four corners" rule, a court initially looks to the language of the contract alone. If the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence. *Id.* (citations omitted). Meijer points out that the 7/26/00 Option Contract contained an integration clause and therefore argues that any additional agreements made between the parties are not part of the contract because they were not included terms. *See Air Safety* ("the negotiations leading to the written contract are not the agreement."). *Id.* at 464.

13

For several reasons, the court does not believe the "four corners" rule requires dismissal of Plaintiff's complaint. First, paragraph 28 states that the 7/26/00 Option Contract "contains the entire agreement between the parties *with respect to the subject matter hereof* . . ." (¶ 28, emphasis added.) Based on the facts alleged and the document itself, the subject matter of the 7/26/00 Option Contract was Meijer's option to purchase approximately 20 acres of the Goodings Grove tract from Plaintiff, not its commitment to begin construction. According to the terms of the Option Contract, Meijer had four months to decide whether to exercise its purchase option. The Option Contract did not address the date for Meijer to begin construction, an issue arguably premature where Meijer had not yet exercised its option.

Furthermore, paragraphs 13 and 14 of the 7/26/00 Option Contract indicate that the parties intended to make future agreements, including a Project Development Agreement and an Operation and Easement Agreement. (7/26/00 Option Contract ¶¶ 13, 14, Ex. 2 to Am. Comp.) Paragraph 13 states in relevant part:

> During the Option Period Purchaser [Meijer] and Seller [Plaintiff] shall negotiate a Development Agreement for execution at closing setting forth terms and conditions for the development and operation of the Development (the 'Development Agreement'), which shall include, but not be limited to, the following provisions:
>
> a.  Seller's performance or construction of the following improvements at no cost to Purchaser, it being agreed by the parties that such improvements are included in the Consideration for the Property and shall be completed after the Date of Closing in accordance with a time schedule to be agreed upon by the Purchaser and Seller as part of the Development Agreement.
>
> d.  Such other matters as the parties may agree.

(7/26/00 Option Contract ¶ 13, Ex. 2 to Am. Comp.) This language satisfies the court that the integration clause does not render evidence of subsequent agreements inadmissible. As Plaintiff urges, construed in the light most favorable to Plaintiff, the SDA, OEA and PUD Submission may fairly be read together with the 7/26/00 Option Contract as a single transaction or agreement. Under Illinois law, multiple writings may be considered together to determine the nature of the

14

agreement at issue. *See, e.g., Pecora v. Szabo,* 94 Ill.App.3d 57, 63, 418 N.E.2d 431, 435-36 (2nd Dist. 1981) (citation omitted). Notably, neither the SDA, DEA, nor the PUD Submission contains an integration clause.

Finally, Meijer's "four corners" argument fails, in this court's view, for yet another reason: The four corners rule would not bar introduction of a subsequent written agreement. Assuming the truth of Plaintiff's allegations, as the court must for purposes of this motion, the court can construe the May 17 and 18, 2001 letters as a subsequent written agreement. *E.A. Cox Co. v. Road Savers Intern. Corp.,* 271 Ill.App.3d 144, 152, 648 N.E.2d 271, 277 (1st Dist. 1995). Meijer challenges this interpretation on two bases -- lack of consideration for the agreement and a lack of congruity between Plaintiff's May 17 "offer" and Meijer's May 18 "acceptance." Neither challenge is persuasive.

The consideration argument simply does not fit the facts. Meijer correctly asserts that consideration does not exist where one simply promises to do what one is already obligated to do. *E.A. Cox,* 271 Ill.App.3d at 152, 648 N.E.2d at 277. An agreement to extend the time of performance of a contract, however, is supported by sufficient consideration where there are mutual acts to be performed by the parties. *Nelson v. Estes,* 154 Ill.App.3d 937, 942, 507 N.E.2d 530, 533 (2nd Dist. 1987) (mutual agreement to orally modify time for payment is sufficient consideration); *Cantrell v. Kruck,* 25 Ill.App.3d 1060, 1064, 324 N.E.2d 260, 263 (2d Dist. 1975) ("agreement to extend time for construction may be viewed as a modification of the contract in which mutual promises import consideration . . . ."). Therefore, even if the court found no additional consideration, the agreement might nonetheless be enforceable because both Plaintiff and Meijer agreed to do what they were already obligated to do.

More importantly, the allegations are inconsistent with the notion that Plaintiff was under an obligation to furnish additional consideration. It was Meijer, after all, who allegedly failed to meet its own August 2001 deadline, and was then given additional time to begin construction. For Meijer

15

now to argue that this was a modification for which *Meijer* is entitled to additional consideration is disingenuous. According to Plaintiff, when Meijer announced that it was not going to meet the August 2001 date, Plaintiff pleaded with Meijer not to completely abandon the project and assured Meijer that the $1.3 million would remain available for construction. (Letter from Collins, Hulina & Riordan to Middlebrook & Price of 5/17/01, Ex. 8 to Am. Comp.) To satisfy Meijer the project was solvent, Plaintiff's partners gave personal guarantees. Meijer's suggestion that these circumstances somehow excuse Meijer's performance strikes the court as quite bold.

Nor is the court persuaded by Meijer's contention that no enforceable contract exists because of the "mirror image" rule. Specifically, Meijer urges that under Illinois law, acceptance of an offer must exactly mirror the offer. *Hills of Palos Condominium Ass'n, Inc. v. I-Del, Inc.*, 255 Ill.App.3d 448, 477, 626 N.E.2d 1311, 1331 (1st Dist. 1993). Meijer emphasizes a purported discrepancy between Plaintiff's May 17, 2001 request and Meijer's May 18 response: The "offer" of May 17, 2001 stated that "[w]e are delivering this letter to you based upon your representation that you will deliver to us a letter from Meijer, stating that you will commence construction on your *store* at 143rd & Bell no later than April 1, 2002, and diligently pursue completion subject only to force majeur. We are expecting to receive your letter by the end of the day tomorrow, so that we can reassure our other tenants of your schedule. . . ." (Letter from Collins, Hulina and Riordan to Middlebrook and Price of 5/17/01, Ex. 8 to Am. Comp. (emphasis added).) Meijer's May 18 response confirmed that "Meijer will commence construction of *the project* at the above-referenced site [143rd & Bell] by April 1, 2002, subject only to delays due to force majeure." (Letter from Middlebrook to Riordan of 5/18/01, Ex. 9 to Am. Comp. (emphasis added).) Meijer argues that because the response referred to the "project" rather than the "store," the acceptance did not mirror the offer and thus no enforceable contract existed. Meijer contends that the term "project," as used in the SDA, OEA and the PUD, contemplate both the SuperStore as well as the convenience store/gas station. Furthermore, Meijer points out it did not agree to the language "diligently pursue

16

completion," an omission that Meijer argues rebuts Plaintiff's claim of an enforceable contract.

The court does not agree that Meijer's use of the term "project" in the May 18 letter somehow excuses its performance. As noted, the documents do not provide a precise definition of the terms: As used in the PUD Submission, "project" apparently refers to the entire Goodings Grove shopping center (PUD Submission, Ex. 3 to Am. Comp.), but the only reference in the SDA is to a "project engineer," and the court found no mention of a project in the OEA. (SDA § 2, Ex. 4 to Am. Comp.) Regardless of the exact meaning of "project" and "store," the parties apparently agree that each term encompasses the SuperStore. It is surely fair, therefore, for the court to interpret the May 18 letter as an acceptance. As the Seventh Circuit said in *Dawson v. General Motors Corp.*, "Illinois courts have not been shy about enforcing promises made in the context of ongoing negotiations and often involving preliminary or 'incomplete agreements.'" 977 F.2d 369, 374 (7th Cir. 1992), citing *Quake Construction, Inc. v. American Airlines, Inc.*, 141 Ill.2d 281, 308, 565 N.E.2d 990, 990 (Ill. 1990) (additional citations omitted). Here, the court rejects Meijer's notion that because its "counteroffer" was *more* inclusive than Plaintiff's proposal, this excuses Meijer's performance altogether. If Meijer's May 18, 2001 letter is read as a counteroffer, then Meijer's arguably broader commitment, signed by Meijer itself, rather than Plaintiff's version, would be enforceable against Meijer.

Even if the court were to construe the May 17/May 18 exchange as ambiguous, the court would not dismiss the breach of contract claim. "If the language of an alleged contract is ambiguous regarding the parties' intent, the interpretation of the language is a question of fact which a [court] cannot properly determine on a motion to dismiss." *Quake Construction*, 141 Ill.2d at 288 , 565 N.E.2d at 994 (citation omitted). At a minium, the court concludes that there is sufficient ambiguity in the alleged offer and acceptance to permit Plaintiff to survive dismissal on its claim for breach of contract.

Meijer also contests Plaintiff's claim for equitable relief. Because the court feels that

17

Plaintiff has adequately pled the elements for equitable relief, the court declines to dismiss this request for relief. Meijer is correct that a remedy requiring an unwilling developer to construct a retail store would be extraordinary and is unlikely to be awarded. Nevertheless, the court will not strike this claim at the pleading stage. *See generally Franklin Point, Inc. v. Harris Trust and Savings Bank*, 277 Ill. App.3d 491, 660 N.E.2d 204 (1st Dist. 1995) (specific performance of a contract requiring construction of a building may be available if plaintiff can demonstrate that court would not be required to supervise or oversee construction). Even if the court is unable to award any equitable relief, damages might be available to make Plaintiff whole. Defendant's motion to dismiss Counts I and II is denied.

**B. Promissory Estoppel**

In Count III, Plaintiff alleges, in the alternative to its breach of contract claims, that the circumstances alleged here support a claim for promissory estoppel. Specifically, Plaintiff claims that in reliance on Meijer's repeated promises to begin construction of the SuperStore first by August 2001, and subsequently by April 1, 2002, Plaintiff expended money, entered into agreements, and made commitments to Meijer and other parties as described above. (Am. Comp. ¶ 52.) Under Illinois law, there are four elements of the promissory estoppel cause of action. First, Plaintiff must allege an unambiguous promise. Second, there must have been reliance on this promise. Third, the reliance must have been expected and foreseeable. Finally, there must be some injury resulting from the reliance. *Fischer v. First Chicago Capital Markets, Inc.*, 195 F.3d 279, 283 (7th Cir. 1999).

Plaintiff has clearly alleged that Meijer made specific promises to begin construction, first in August 2001 and then by April 1, 2002. Plaintiff has also sufficiently pleaded that it took action in reliance on these promises: Plaintiff alleges, first, that it never would have sold Meijer the 20 acres had Meijer not promised to begin construction by August 2001. (Am. Comp. ¶ 11.) Further,

Plaintiff alleges that Reliant exercised its option to purchase the approximately 68 acres from Orchard Hill for $12,900,000 in reliance on Meijer's promise. (*Id.* ¶ 13.) Plaintiff claims it agreed to accelerate the development of the land to accommodate Meijer's planned construction of the SuperStore. (*Id.* ¶ 12.) After Meijer later promised to begin building on April 1, 2002, Plaintiff allegedly engaged in numerous activities to prepare for Meijer to begin construction. (*Id.* ¶ 15.) For example, Plaintiff claims it entered into contracts with third parties to sell, for millions of dollars, portions of the remaining 48 acres, agreeing with the third parties to delay closing until Meijer began construction. (*Id.*) Plaintiff has adequately pleaded the element of reliance.

Nor is the foreseeability element missing. It is foreseeable that, in reliance on a promise to begin construction by a certain date, Plaintiff would have engaged in costly and time-consuming activities to prepare for Meijer to start building. The parties allegedly had an agreement to develop a shopping center. If, as Plaintiff alleges, Meijer actually promised to begin construction by certain dates, it is undeniably reasonable to expect that Plaintiff would have undertaken the preparations it did.

Finally, Plaintiff has sufficiently pleaded that injury resulted from its reliance on Meijer's promises. Plaintiff claims that it has lost millions of dollars resulting from Meijer's breach of its promises to construct a SuperStore on the Goodings Grove property, and that it may default on its loan from LaSalle Bank, given its promise that Meijer would begin construction before December 31, 2001. (*Id.* ¶¶ 47, 53.)

The court recognizes that if Plaintiff is successful in its breach of contact claim, the promissory estoppel claim will be dismissed. Where a promisee is obligated to perform under a written contract, then it is unnecessary to resort to a doctrine which is intended to permit recovery for promises which lack consideration. *Prentice v. UDC Advisory Services, Inc.*, 271 Ill.App.3d 505, 511, 648 N.E.2d 146, 150 (1st Dist. 1995). But the court will allow both claims to stand at this stage, because the federal pleading rules allow a plaintiff to plead inconsistent contractual theories

at this early stage in the proceedings. *Pasant v. Jackson Nat'l Life Ins. Co.*, 768 F. Supp. 661, 663 (N.D. Ill. 1991). Plaintiff has adequately pleaded the elements of promissory estoppel under Illinois law, and therefore Meijer's motion to dismiss Count III is denied.

## C.  Negligent Misrepresentation

Finally, Count IV of Plaintiff's Amended Complaint alleges that Meijer made negligent misrepresentations which injured Plaintiff in the amount of millions of dollars. (Am. Comp. ¶ 55.) Negligent misrepresentation consists of: (1) a false statement of material fact, (2) carelessness or negligence in ascertaining the truth of the statement by the party making it, (3) an intention to induce the other party to act, (4) action by the other party in reliance on the truth of the statement, and (5) damage to the other party resulting from such reliance, (6) when the party making the statement is under a duty to communicate accurate information. *Neptuno Treuhand-Und Verwaltungsgesellschaft MBH v. Arbor*, 295 Ill.App.3d 567, 572-74, 692 N.E.2d 812, 818 (1st Dist. 1998). As Meijer correctly points out, the Supreme Court of Illinois held in *Moorman v. Manufacturing Co. v. National Tank Co.*, that a manufacturer can not be held liable under a negligent misrepresentation theory for solely economic losses caused. 91 Ill.2d 69, 435 N.E.2d 443 (Ill. 1982). Economic loss is recoverable only "where one who is in the business of supplying information for the guidance of others in their business transactions makes negligent representations." *Id.* at 88-89.

To satisfy this requirement imposed by *Moorman*, a plaintiff must allege that the defendant is in the business of supplying information for the guidance of others in their business dealings. *Tolan & Son, Inc. v. KLLM Architects, Inc.*, 308 Ill.App.3d 18, 27, 719 N.E.2d 288, 296 (1st Dist. 1999). Plaintiff has not alleged that Meijer is in the business of supplying information for the guidance of others in their business dealings, and the circumstances presented in the complaint--in which Meijer was acting as a business partner in developing retail property, not as a consultant--

are inconsistent with such a theory.

In those cases where plaintiffs have been permitted to proceed under a negligent misrepresentation theory, the product received by the plaintiff was purely information—analytical work rather than a tangible product. *See, e.g., Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 159 Ill.2d 137, 157, 636 N.E.2d 503, 512 (Ill. 1994) (applying exception to bar on recovery for economic loss in a negligent misrepresentation claim against accountants); *Notaro Homes, Inc. v. Chicago Title Insurance Co.*, 309 Ill.App.3d 246, 257, 722 N.E.2d 208, 216 (2nd Dist. 1999) (recognizing exception for title insurers). *Schrager v. North Community Bank*, cited by Plaintiff, falls under this rubric. The plaintiff in *Schrager* was an investor who brought suit against his bank and its officers for providing him with false and fraudulent information about individuals with whom he was contemplating doing business. 328 Ill.App.3d 696, 767 N.E.2d 376 (1st Dist. 2002). Defendants told the plaintiff that the prospective business partners were "excellent real estate developers, very good customers of the bank, and very good business men." *Id.* at 700, 767 N.E.2d at 379. The plaintiff claimed he relied on defendants' remarks in deciding to become a guarantor of a loan and in deciding to invest more than $4 million into development deals with two individuals. *Id.*, 767 N.E.2d at 380. Although the court did not address the issue, the opinion reflects that the defendants' statements to the plaintiff were informational, intended to guide the plaintiff to make a decision.

In contrast, when the information offered by the defendant relates to the defendant's tangible goods or non-informational goods or services, the information is considered merely ancillary or incidental, and the defendant is not deemed to be in the business of providing information and is not liable for negligent misrepresentation. *Fox Associates, Inc. v. Robert Half Intern. Inc.*, __ Ill.App.3d __, 777 N.E.2d 603, 607 (1st Dist. 2002) (affirming dismissal of claim against a temporary agency for recovery of losses resulting from a temporary worker's wrongdoing). The present case falls into this category. Meijer allegedly told Plaintiff it would begin

construction in August 2001 and then by April 2002. These promises were not meant to "guide" Plaintiff the way a real estate agent ensures good title, or in the way a banker might refer a company to an investor. Rather, Meijer simply told Plaintiff when it expected to begin providing the "services" allegedly contracted for, that is, when it would begin building the SuperStore. Meijer's motion to dismiss Count IV of Plaintiff's Amended Complaint is therefore granted.

## CONCLUSION

For the foregoing reasons, Meijer's motion to dismiss (Doc. No. 12-1) is granted in part and denied in part. Count IV is dismissed without prejudice. Defendant's motion to dismiss Counts I, II and III is denied.

ENTER:

Dated: November 22, 2002

REBECCA R. PALLMEYER
United States District Judge